IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JENNIFER BARNES,                       )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )      C.A. No. 2017-0735-MTZ
                                       )
SPROUTS FARMERS MARKET, INC.,          )
                                       )
        Defendant.                     )

MASTER'S REPORT

Date Submitted:  April 5, 2018
Draft Report:  May 2, 2018
Final Report:  July 18, 2018

Blake A. Bennett, Esquire, of COOCH AND TAYLOR, P.A., Wilmington, Delaware; OF COUNSEL:  Brian J. Robbins, Esquire, Felipe J. Arroyo, Esquire, and Steven R. Wedeking, Esquire, of ROBBINS ARROYO LLP, San Diego, CA; Attorneys for Plaintiff.

S. Mark Hurd, Esquire and Alexandra M. Cumings, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Michael D. Blanchard, Esquire, of MORGAN, LEWIS & BOCKIUS LLP, Hartford, CT; Attorneys for Defendant.

ZURN, Master

This case involves a demand to inspect the books and records of a grocery store chain that allegedly failed to disclose that it was experiencing significant produce deflation at the time of a stock offering. The plaintiff seeks to inspect the company's books and records in order to investigate potential breaches of duty, corporate mismanagement, wrongdoing, and unjust enrichment by the company's fiduciaries. The defendant argues the plaintiff is not entitled to inspection because she has not shown a credible basis to infer wrongdoing or mismanagement.

In this post-trial final report, I conclude the plaintiff has established a credible basis from which a court can infer that wrongdoing or mismanagement may have occurred.

## I. Background[1]

Plaintiff Jennifer Barnes ("Plaintiff") alleges she is a stockholder of Defendant Sprouts Farmers Market, Inc. ("Sprouts"), and has been at all relevant times.[2] Sprouts, a Delaware corporation, is a grocery store chain offering fresh, natural, and organic food, including fresh produce, bulk foods, vitamins and supplements, packaged groceries, meat and seafood, deli, baked goods, dairy

---

[1] The facts in this report reflect my findings based on the parties' briefing, appended exhibits, and trial on that paper record held on February 23, 2018. I grant the evidence the weight and credibility that I find it deserves. Citations to the trial transcript are in the form "Tr. #." Plaintiff's exhibits, submitted in support of Plaintiff's pretrial briefs, are cited as "PX #," and Defendant's exhibits, submitted in support of Defendant's pretrial briefs, are cited as "DX #."

[2] For purposes of this report, the defendant has not disputed Plaintiff's standing as a stockholder.

products, frozen foods, beer and wine, natural body care, and household items.[3] Sprouts seeks to distinguish itself by offering fresh, high quality produce at low prices, and produce sales generate approximately twenty-five percent of Sprouts' revenue.[4] Sprouts was founded in 2002 and as of November 1, 2017, comprised 285 stores in fifteen states.[5]

Nonparty Apollo Global Management is an investment fund that is affiliated with and manages funds called AP Sprouts Holdings, LLC and AP Sprouts Holdings (Overseas) LP. I refer to all three entities collectively as "Apollo." Nonparty Andrew S. Jhawar ("Jhawar") is a senior partner of Apollo Global Management and the chairman of Sprouts' board.[6]

Sprouts held its initial public offering ("IPO") on August 1, 2013.[7] Immediately prior to Sprouts' IPO, Apollo owned over fifty percent of Sprouts' stock.[8] In contemplation of the IPO, Sprouts granted Apollo the right to require Sprouts to file up to five registration statements with the SEC for the resale of Apollo's Sprouts stock.[9] After the IPO, Apollo held 44.5% of Sprouts' stock.[10]

---

[3] PX E at 5.
[4] PX F at 6; PX G at 2; PX H at 24.
[5] PX E at 17.
[6] PX I at 6.
[7] *Id*.
[8] *Id*.
[9] PX J at 9.
[10] *Id.*

Apollo sold a majority of that stock in four registered secondary offerings in November of 2013, March of 2014, August of 2014, and November of 2014.[11]

Apollo sold its remaining 10.4% of Sprouts stock in a fifth and final secondary offering ("the Secondary Offering"), which opened on March 6, 2015.[12] The offering documents include a SEC Form S-1 registration statement and a prospectus, filed on March 4, 2015.[13] The offering documents were signed by numerous officers and directors, including Jhawar as chairman of Sprouts' board and as an Apollo vice president.[14] Sprouts disclosed Jhawar's dual roles in connection with the Secondary Offering.[15] The Secondary Offering closed on March 10, 2015.[16] Apollo sold all its remaining shares at $35.30 per share, raising nearly $560 million in gross proceeds.[17] Apollo was the only investor who sold in the Secondary Offering.[18]

In mid-February 2015, Sprouts began experiencing produce deflation.[19] The Secondary Offering documents filed on March 4, 2015, did not mention this deflation. The Secondary Offering's registration statement incorporated Sprouts'

---

[11] PX I at 6.
[12] PX I.
[13] *Id.*
[14] *Id*.
[15] *Id.* at 6.
[16] PX K.
[17] *Id.*
[18] PX I at 6.
[19] PX L at 3, 8; PX M at 3.

3

2014 Annual Report on Form 10-K dated February 26, 2015.[20]  The 10-K disclosed

the importance of produce, its volatile pricing, and that volatility's general impact

on Sprouts' business, as follows:

> [I]nflation or deflation can impact our business.  Food deflation
> could reduce sales growth and earnings, while food inflation,
> combined with reduced consumer spending, could reduce gross profit
> margins.[21]

> …

> Inflation and deflation in the prices of food and other products
> we sell may periodically affect our sales, gross profit and gross
> margin.  The short-term impact of inflation and deflation is largely
> dependent on whether or not the effects are passed through to our
> customers, which is subject to competitive market conditions.  In the
> first half of fiscal 2012, we experienced produce price deflation,
> which contributed to higher gross margins in our business during that
> period and the full fiscal year.
> Food inflation and deflation is affected by a variety of factors
> and our determination of whether to pass on the effects of inflation or
> deflation to our customers is made in conjunction with our overall
> pricing and marketing strategies.  Although we may experience
> periodic effects on sales, gross profit and gross margins as a result of
> changing prices, we do not expect the effect of inflation or deflation to
> have a material impact on our ability to execute our long-term
> business strategy.[22]

Sprouts' financial results for the first quarter of 2015, reported on May 7,

2015, included lower gross profit margins and sales growth slightly below the

---

[20] PX I at 19.
[21] PX H at 25.
[22] *Id.* at 61.

projected guidance level for the quarter.[23]  Sprouts issued a press release that day

explaining the lower numbers were "primarily driven by produce tightness due to

adverse weather conditions and West Coast port strikes that limited product

availability."[24]  On an earnings call that same day, Douglas Sanders ("Sanders"),

who was then serving as Sprouts' Chief Executive Officer, President, and Director,

stated the lower sales growth was "primarily driven by 3 factors":  first, tightness

in produce quality and supply due to weather and port challenges; "[s]econd, we

began experiencing accelerating produce deflation in mid-February as supply

improved, which increased significantly throughout March;" and third, severe

weather in several markets that negatively impacted sales.[25]  On that same call,

Amin N. Maredia ("Maredia"), who was then acting as Chief Financial Officer and

Treasurer, elaborated on the deflation:  "[W]e began seeing in the middle of

February, acceleration and deflation in the produce area through the end of

February as well as all the way through March and continuing into April."[26]

Two weeks later, at a conference on May 21, 2015, Maredia reiterated

Sprouts' experience with price deflation in the first quarter of 2015.  He explained:

> And in the back half of the quarter, we saw something pretty unusual,
> which we had not seen before, frankly, with the port issues, we started
> to see a tremendous amount of deflation.  In February, we saw huge

---

[23] *Compare* DX D (providing guidance for the first quarter of 2015) *with* PX N *and* PX L; *see* Ans. ¶ 20.

[24] PX N.

[25] PX L at 3.

[26] *Id.* at 8.

deflation in certain categories, which could not get outside United States. And then when the port issue was resolved, we saw a glut of product come into the United States, which caused significant deflation in that category.[27]

The deflation continued. On August 6, 2015, Sprouts announced its results for the second quarter of 2015[28] and held a conference call.[29] Sanders, then serving as Executive Chairman, noted the growth Sprouts achieved in that quarter "was offset by a deflation of nearly 10% in April."[30] Sanders described the deflation as "significant" and acknowledged produce deflation "has a greater impact on Sprouts due to the high volume of produce we sell."[31] James L. Nielson, then serving as President and Chief Operating Officer, stated deflation had not subsided like Sprouts had predicted it would.[32] And Maredia stated that deflation "hurt our comps by nearly 200 basis points in sort of May and June as we sort of ended the quarter."[33]

On March 24, 2016, an investor brought a class action lawsuit against Sprouts and an array of its officers and directors, including Sanders, Maredia, and Jhawar, in Arizona state court ("the Arizona Action"). The complaint in the

---

[27] PX M at 3. I interpret this statement to mean that issues with one or more shipping port(s) trapped produce inside the United States and created a glut of produce that could not enter the United States, and that both of these phenomena contributed to deflation.
[28] PX O.
[29] PX P.
[30] *Id.* at 3.
[31] *Id.*
[32] *Id.* at 9.
[33] *Id.*

Arizona Action ("the Arizona Complaint") alleges Sprouts violated Section 11 of the Securities Act of 1933 by failing to disclose Sprouts was suffering from a produce deflation trend at the time of the Secondary Offering.[34]  Specifically, the Arizona Complaint asserts that at the time of the Secondary Offering, the deflation was a known trend required to be disclosed under Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303").  Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  The Arizona Complaint relies on the statements Sprouts made about deflation and its effects after the Secondary Offering as set forth above, including Sprouts' May 7, 2015, press release; the statements by Sanders and Maredia on the May 7, 2015 earnings call; Maredia's May 21, 2015, statements; and the statements by Sanders and Nielson on the August 6, 2015, earnings call.[35]  Sprouts moved to dismiss the Arizona Complaint.

On August 25, 2017, the Arizona court denied Sprouts' motion to dismiss the Section 11 claim.[36]  The Arizona court noted it was applying "ordinary notice

---

[34] PX Q.

[35] *Id.*, ¶¶ 45-49.

[36] PX R.  The Arizona court dismissed other claims against Sprouts under Sections 12 and 15 of the Securities Act.  *Id.* at 11.

7

pleading" standards, assuming the truth of all well-pleaded factual allegations and indulging all reasonable inferences from those facts.[37] The Arizona court noted the alleged "known trend" of deflation "started a mere 18 days before the offering," and concluded that whether the 18-day produce price deflation was a "known trend or simply a periodic price fluctuation is an issue ill-suited to be resolved by a motion to dismiss on an undeveloped record."[38] The court reviewed the statements by Sprouts' officers and directors regarding deflation after the Secondary Offering under Arizona's pleading standards and concluded they "could be read to mean that Sprouts was aware of a trend" at the time of the Secondary Offering.[39] "Read liberally, these statements support plaintiff's claims that the February deflation was something more than a periodic price fluctuation."[40] The Arizona court also concluded that under motion to dismiss standards, the Arizona Complaint gave fair notice of the claim that Sprouts knew of the price deflation "in February."[41] Accordingly, the Arizona court denied the motion to dismiss the Section 11 claim against Sprouts.[42]

---

[37] *Id.* at 4.
[38] *Id.* at 7, 8.
[39] *Id.* at 9.
[40] *Id.*
[41] *Id.* at 9-10.
[42] *Id.* at 11.

The case pending in this Court began when Plaintiff sent Sprouts an undated demand for books and records that Sprouts received on March 1, 2017.[43] Plaintiff's stated purpose "is to investigate potential breaches of duty, corporate mismanagement, wrongdoing, and unjust enrichment by fiduciaries of [Sprouts], including Sprouts' Board."[44] Plaintiff states that upon reviewing the demanded records, she may seek an audience with Sprouts' board of directors or pursue litigation.[45]

Sprouts rejected Plaintiff's demand for books and records by letter dated March 17, 2017, arguing Plaintiff lacked a proper purpose.[46] On October 17, 2017, Plaintiff filed a verified complaint under 8 *Del. C.* § 220. When Plaintiff filed this action, Sprouts' stock traded at approximately $18.60 per share.[47] Sprouts answered the complaint on November 6, 2017.

The parties stipulated the proceedings would be bifurcated into two stages: a first stage, on the issue of whether Plaintiff has shown a proper purpose, to be adjudicated on a paper record; and a potential second stage for conferring and potential adjudication on production of documents. The first stage went to trial on February 28, 2018. On April 4 and 5, 2018, the parties submitted requested

---

[43] PX A; PX B.
[44] PX A at 1.
[45] *Id.*
[46] *See* PX C.
[47] Pl.'s Decl. of Blake Bennett ¶ 3.

supplemental briefing.  I issued a draft report on May 2, 2018.  Sprouts took

exception, and the parties briefed those exceptions.  This is my final report.

## II.    Analysis

Under Section 220 of the Delaware General Corporation Law, stockholders

of a Delaware corporation have the right to inspect the books and records of a

company for any proper purpose.[48]  A proper purpose includes "a purpose

reasonably related to such person's interest as a stockholder."[49]  "[A] stockholder

has the burden of proof to demonstrate a proper purpose by a preponderance of the

evidence."[50]

"It is well established that a stockholder's desire to investigate wrongdoing

or mismanagement constitutes a 'proper purpose.'"[51]  The stockholder is not,

however, "required to prove by a preponderance of the evidence that waste and

[mis]management are actually occurring."[52]  Instead, a plaintiff who seeks to

investigate wrongdoing or mismanagement must show "'some evidence' to suggest

a 'credible basis' from which a court can infer that mismanagement, waste or

wrongdoing may have occurred."[53]  The "'credible basis' standard sets the lowest

---

[48] 8 *Del. C.* § 220.

[49] 8 *Del. C.* § 220(b).

[50] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

[51] *Id.*

[52] *Id.* at 123 (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co. Inc.*, 681 A.2d 1026, 1031 (Del. 1996)).

[53] *Id.* at 118.

possible burden of proof."[54]  The credible basis standard can be satisfied through

"documents, logic, testimony or otherwise."[55]

Plaintiff seeks Sprouts' books and records for the purpose of investigating

potential wrongdoing, including potential breaches of fiduciary duty.  She claims

this Court can infer that Sprouts' directors and officers engaged in wrongdoing by

failing to disclose that produce deflation was harming Sprouts at the time of the

Secondary Offering.  Plaintiff argues Sprouts' managers' statements in the spring

and summer of 2015, that "we began seeing" "huge" and "significant" deflation in

February 2015, allow the Court to infer Sprouts' fiduciaries knowingly failed to

disclose Sprouts was experiencing material deflation at the time of the March 4

Secondary Offering.[56]  Plaintiff also argues an inference of wrongdoing is

supported by the significance of produce and its volatile pricing to Sprouts'

business, the fact that Apollo orchestrated the Secondary Offering for its own

benefit, and by Jhawar's dual roles as an Apollo senior partner and chairman of

Sprouts' board.  Plaintiff concludes the Secondary Offering documents violate the

Securities Act of 1933 under Item 303 by "fail[ing] to disclose a known trend in

---

[54] *Id.* at 123.
[55] *Id.*
[56] *See* PX L at 3; PX L at 8; PX M at 3.

the deflation of the price of produce and the deleterious effect on Sprouts that this deflation would cause."[57]

Sprouts interprets Sprouts' statements in the spring and summer of 2015 as backward-looking descriptors of past conditions, which fail to show Sprouts' management had contemporaneous knowledge of those conditions at the time of the Secondary Offering. Sprouts notes that pricing data necessarily trails the occurrence of pricing fluctuation.[58] Sprouts also argues that the use of the pronoun "we" does not identify (and therefore incriminate) officers or directors, but rather, refers to the company as a whole. Sprouts concludes Plaintiff failed to meet her burden because she fails to demonstrate Sprouts' directors or officers knew Sprouts was experiencing the deflation that began in mid-February when they signed the Secondary Offering documents dated March 4. Sprouts further contends Plaintiff has failed to show Sprouts' fiduciaries knew, or could even predict, the deflation would harm Sprouts. Sprouts also argues that neither Apollo's presence on the board, nor its role in arranging the Secondary Offering, supports an inference of wrongdoing because the other Sprouts officers and directors, who were unaffiliated with Apollo, would have had to engage in wrongdoing to benefit Apollo against

---

[57] Compl. ¶ 3. This Court cannot determine whether false disclosures violated federal securities law, but it can conclude that those disclosures constitute credible evidence of possible wrongdoing and mismanagement. *Somerville S. Trust v. USV Partners, LLC*, 2002 WL 1832830, at *6 (Del. Ch. Aug. 2, 2002).

[58] DX G, H (noting government pricing reports provide preliminary pricing data after one month).

common sense and logic. Sprouts argues that the two-week deflationary period prior to the Secondary Offering cannot, as a matter of law, constitute a "trend" under Item 303. Sprouts uses the elements of a breach of duty of disclosure claim under *Malone v. Brincat* to frame its arguments.[59]

Before considering Sprouts' arguments, I must first determine whether they are premature merits-based defenses, or whether they strike at the evidence and logic Plaintiff offers as a basis for inferring possible wrongdoing.[60] This Court has repeatedly stated that a Section 220 proceeding does not warrant a trial on the merits of underlying claims.[61] Indeed, "the Delaware Supreme Court has made it clear that the public policy of this State is to encourage stockholders to utilize Section 220 *before* filing a derivative action … in order to meet the heightened

---

[59] 722 A.2d 5 (Del. 1998).

[60] This issue was the focus of the parties' briefing on Sprouts' exceptions to my draft report.

[61] *E.g.*, *Lavin v. W. Corp.*, 2017 WL 6728702, at *1 (Del. Ch. Dec. 29, 2017) ("Any contrary finding would invite defendants improperly to draw the court into adjudicating merits defenses to potential underlying claims in order to defeat otherwise properly supported Section 220 demands."); *Okla. Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2014 WL 5351345, at *6 (Del. Ch. Sept. 30, 2014) [hereinafter *Citigroup*] ("Although Citigroup disclaims any effort to turn this proceeding into a trial on the merits of Plaintiffs possible derivative claims, Citigroup essentially seeks that result by implying that Plaintiff must have specific, tangible evidence that Citigroup's Board or senior management was complicit in the fraud at Banamex. That argument ignores the inferences that this Court can—and must—draw under the credible basis standard, and would discourage the very behavior this Court has sought to encourage among would-be derivative or class plaintiffs."); *La. Mun. Police Emps.' Ret. Sys. v. Countrywide Fin. Corp.*, 2007 WL 2896540, at *12 (Del. Ch. Oct. 2, 2007) [hereinafter *Countrywide*] (rejecting, in a Section 220 proceeding, an argument that no springloading ever occurred because "by raising such a defense, Countrywide seeks to litigate the ultimate issue in a possible future derivative suit that might eventually be filed by [Plaintiff]. This is neither the time nor the procedural setting to address that issue.").

pleading requirements … applicable to such actions."[62]  "Delaware courts

generally do not evaluate the viability of the demand based on the likelihood that

the stockholder will succeed in a plenary action."[63]  In a books and records action,

this Court considers only those arguments from a defendant that inform whether

the plaintiff's evidence provides a credible basis for the Court infer possible issues

of wrongdoing.[64]

In *Countrywide*, the Court parsed the defendant's arguments into those it

could consider in determining whether the plaintiff had established a credible basis

from which a court could infer wrongdoing, and those it could not consider

because they went to whether wrongdoing actually occurred.[65]  In that case, the

plaintiff presented an expert who had developed a statistical model that he believed

indicated, with statistical significance, that some type of option manipulation may

have occurred.[66]  The defendant presented its own expert, who presented two

counterarguments:  a critique of the plaintiff's expert's methodology, and

affirmative evidence seeking to prove that springloading was not possible in that

case and therefore could not constitute a credible basis to infer possible

wrongdoing.[67]  The Court entertained the first argument, describing it as

---

[62] *Freund v. Lucent Techs.*, 2003 WL 139766, at *4 (Del. Ch. 2003) (emphasis added).
[63] *Lavin*, 2017 WL 6728702, at *9.
[64] *Countrywide*, 2007 WL 2896540, at *12.
[65] *See id.*
[66] *Id.*
[67] *Id.* at *7.

undercutting the testimony and analysis of the plaintiff's expert, but ultimately concluded the plaintiff's expert's analysis was not so fundamentally flawed as to be rejected.[68]  The Court rejected the defendant's evidence that springloading could not have occurred, because that evidence went to the issue of whether wrongdoing actually occurred, not whether the plaintiff's analysis provided a credible basis to infer possible wrongdoing.[69]

In determining whether Plaintiff has established a credible basis from which the Court could infer possible wrongdoing, I will consider Sprouts' argument that the managers' statements are not fairly read to indicate they had contemporaneous knowledge of deflation conditions at the time of the Secondary Offering.  This is akin to Countrywide's attack on the plaintiff's expert's methodology.  Sprouts' argument hinges on the meaning of the managers' phrases, such as "we began seeing" and "we saw."  Sprouts and Plaintiff disagree on to whom "we" refers, and what level and timing of knowledge is imputed by "began seeing."

As Sprouts points out, Plaintiff's interpretation, under which "we" refers to the managers and "began seeing" imputes personal knowledge to the managers at least as of the Secondary Offering, is not ironclad.  But at this stage it does not need to be:  the statements, together with the rest of Plaintiff's allegations, need

---

[68] *Id.* at *11-12.
[69] *Id.* at *12.

only provide *some evidence* from which I *can infer* that wrongdoing *possibly* occurred.  Sprouts' countervailing interpretation does not convince me to reject Plaintiff's.  I conclude a court could interpret the statements as Plaintiff does, and infer possible wrongdoing.

In my view, the rest of Sprouts' arguments are merits defenses, akin to the arguments that wrongdoing could not have occurred that were dismissed in *Countrywide*.  Sprouts offers its own affirmative evidence in the form of government pricing data to attempt to show that its managers *could not* have had contemporaneous knowledge of deflation at the time of the Secondary Offering.  Sprouts further argues its managers *could not* have predicted that deflation would continue or harm Sprouts.  Finally, Sprouts argues its managers *would not* have made an inadequate disclosure to benefit Apollo.

All of these arguments go to whether or not wrongdoing actually occurred: if the managers did not and could not have known about the deflation and its future effects, they cannot have committed wrongdoing in failing to disclose it.  Sprouts' argument that Plaintiff failed to show Sprouts' managers knew about the deflation and its effects, and that the managers intended to misinform, also resembles the merits-based argument discarded in *Citigroup*:  "that a stockholder must have specific and concrete evidence of possible wrongdoing or mismanagement by the board or senior management before the Court may permit a Section 220

16

inspection."[70] Sprouts even aligns these arguments with the elements of a duty of disclosure claim under *Malone v. Brincat*.[71] The inquiry is not whether Plaintiff has shown a credible basis to infer all the elements of a specific claim, but rather, general wrongdoing.[72] I conclude Sprouts' arguments as to what the managers could or would have known, predicted, or done, are premature merits-based arguments.

Even if I accepted Sprouts' merits-based arguments as attacks on the evidentiary support and logic underpinning Plaintiff's credible basis theory, Plaintiff's low burden of proof would compel the same result. Plaintiff need only provide some evidence to allow an inference of possible wrongdoing. In my view, the managers' statements interpreted as Plaintiff suggests, made in the context of incredible deflation in an area essential to Sprouts' business, and in the context of Apollo's presence on the board, allows such an inference. Connecting the dots Plaintiff offers sketches out wrongdoing. That sketch might be more complete with additional dots, such as the managers' prediction that the deflation would continue and be material, or the managers' motivation to aid Apollo in the

---

[70] *See* 2014 WL 5351345, at *6.

[71] Def. Op. Br. on Exceptions at 3 (citing *Malone v. Brincat*, 722 A.2d 5 (Del. 1998)).

[72] The distinction between a specific claim and general wrongdoing is particularly meaningful in this case, where the claim used to define the alleged wrongdoing was identified by the defendant, not the plaintiff.

17

Secondary Offering and intent to misinform. But I can connect the dots Plaintiff did offer, so I conclude Plaintiff has met her low burden.

Finally, I address Plaintiff's reliance on the Arizona court's denial of the motion to dismiss the Arizona Complaint, which was based on the same allegations and evidence presented in this case. The parties agree that a shareholder seeking books and records fails to state a credible basis for the Court to infer wrongdoing when the plaintiff relies solely on the fact that others have sued the company.[73] The parties also agree that in this Court's recent decision in *In re UnitedHealth Group, Inc. Section 220 Litigation*, the Court reviewed the plaintiff's proffered evidence of wrongdoing without regard for a different court's denial of a motion to dismiss based on the same evidence and allegations.[74] Taking instruction from *UnitedHealth*, the Arizona court's denial of the motion to dismiss does not alter my conclusion in this case.

---

[73] *See Graulich v. Dell*, 2011 WL 1843813, at *5 n.49 (Del. Ch. May 16, 2011).
[74] 2018 WL 1110849, at *7 n.91 (Del. Ch. Feb. 28, 2018).

## III. Conclusion

For the foregoing reasons, I recommend the Court find Plaintiff has demonstrated a proper purpose for her demand for Sprouts' books and records. This is a final report pursuant to Court of Chancery Rule 144.

Respectfully,

*/s/ Morgan T. Zurn*

Master in Chancery